UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-00042 |
| | ) | Judge Echols |
| HAROLD MATHIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the Court are Defendant Harold Mathis' Motion to Suppress (Docket Entry No. 20), and his Amended and Supplemental Motion to Suppress (Docket Entry No. 29), to which the Government responded in opposition. At the conclusion of the suppression hearing held on June 30, 2005, the Court denied both Motions. The Court now sets forth the reasoning for its decision.

The grand jury indicted Defendant Mathis on one count of knowingly receiving or attempting to receive child pornography that had been transported in interstate or foreign commerce, in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and 2252A(b)(1).

### I. FINDINGS OF FACT

The Defendant's sixteen-year old son disclosed to his psychotherapist, Johanna Shadoin, that he saw pornographic images of children on his father's computer at home and that he had witnessed his father sitting naked at his computer in front of a webcam. Two of the graphic images depicted sexual penetration of

1

an infant and a young child performing oral sex on an adult male. Ms. Shadoin reported the disclosure to the treating psychiatrist and the office's coordinator for the Health Insurance Portability and Accountability Act ("HIPAA").[1]  The three of them discussed their concerns about the psychological effect the graphic images could have on Defendant's son, about the child sexual abuse depicted in the images, and the danger to other potential victims. Defendant's son had given no indication that Defendant had sexually abused him.  After considering the Tennessee reporting law, HIPAA, and the ethical codes applicable to their conduct, the treatment professionals decided to report the allegations to law enforcement authorities.  The psychiatrist contacted her brother, who is a homicide detective in Texas, for advice.  He consulted with a Texas District Attorney, who advised making a report to the FBI, which was done.  The Texas FBI then contacted Bret Curtis, Special Agent with the FBI in Nashville, Tennessee, on March 1, 2005, and relayed the information received.

On March 1, Agent Curtis interviewed Ms. Shadoin to confirm the substance of the allegations.  Ms. Shadoin repeated to Agent Curtis what Defendant's son had told her about the graphic computer images.  She also told Agent Curtis that Defendant's son disclosed

---

[1] Defendant and his former spouse, who share joint custody of their sixteen-year old son, each signed a form in 2003 indicating receipt of a copy of the "Notice of Privacy Practices for Protected Health Information" of Richland Creek Psychiatric Associates, where their son was treated.  (Government Ex. 5.)

2

his girlfriend received a photo of the Defendant, nude from the waist up, via the Internet, and that Defendant had engaged in an inappropriate telephone conversation with his son's girlfriend. Ms. Shadoin did not disclose to Agent Curtis any medical information or medical or billing records concerning treatment of Defendant's son. At Agent Curtis' request, Ms. Shadoin tried to reach Defendant by telephone to obtain permission for Agent Curtis to interview Defendant's son, but Defendant did not answer.

Late in the afternoon of March 1, Agent Curtis went to Defendant's home at 424 Nesbitt Lane in Madison, Tennessee. Defendant, who is approximately 45 years of age and divorced, lives on the main floor of the home with his sixteen-year old son. An older son lives in the basement with his girlfriend. Agent Curtis asked a Nashville police officer who is affiliated with the sex crimes unit to accompany him because he did not know at that time if a child sexual abuse investigation would ensue.

Defendant's sixteen-year old son answered Agent Curtis' knock on the door and invited them in after they identified themselves as law enforcement officers.[2] He stated he had been expecting them, and thought they were there about his truancy. Agent Curtis clarified that they were present to talk with him about the

---

[2] Defendant had previously instructed his son not to allow strangers into the house without Defendant's permission.

3

information he provided to Ms. Shadoin. Agent Curtis then interviewed Defendant's son about the matters he had disclosed.

During or after the interview, Agent Curtis contacted FBI Special Agent Brandon Harcum and asked him to obtain a federal search warrant for a computer located in the front room of the residence, including hard drives and software such as compact discs, diskettes, and other magnetic storage media, and all images, photographs, and/or video with child pornography or children in sexual situations. Agent Curtis provided Agent Harcum with the information needed to prepare the search warrant application. Agent Curtis also contacted task force officers and asked them to come to the house in anticipation of a search. Agent Curtis asked Defendant's son to disconnect the power to Defendant's computer to preserve any evidence that might be on it, but neither he nor the other officers searched the computer or any other part of the house at that time.

While Agent Curtis was present at the house, Defendant called and spoke to his son. Agent Curtis asked to speak to the Defendant, identified himself as a law enforcement officer, and asked when Defendant would be home because he wanted to talk with him. Defendant stated he was on his way, and he arrived at the residence shortly before 5:00 p.m. Defendant testified Agent Curtis asked if he was coming home and did not command him to come to the residence.

4

Six law enforcement officers were present at the house when Defendant arrived, although not all of them were inside the house. Agent Curtis identified himself as an FBI Agent and showed Defendant his credentials. He immediately advised Defendant of his <u>Miranda</u> rights and asked Defendant if he understood his rights. Defendant stated that he did understand his rights. Defendant voluntarily signed an "Advice of Rights" form in the presence of Agent Curtis and another witness at 5:03 p.m. (Government Ex. 1.) Defendant told Agent Curtis that he had child pornography on his computer. Agent Curtis disclosed that another agent was in the process of obtaining a search warrant and asked Defendant if he would provide his permission to allow the officers to begin the search before the search warrant arrived. Believing that a search warrant was on its way, Defendant signed a "Consent to Search" form permitting a search of "computers, computer equipment, photographs of children in sexual poses, CDs used to store photographs (any and all storage media) in the house 424 Nesbitt Lane" and "(All e-mail accounts operated by Harold Mathis) and Instant Message Accounts." (Government Ex. 2.) Defendant also signed a "Consent to Assume Identity of Screen Names on the Internet" form to permit Agent Curtis to use Defendant's screen names, passwords and identity on the Internet. (Government Ex. 3.) Defendant told Agent Curtis he could show him where on the computer the pornographic material was located. Although Defendant felt the presence of so many officers

5

was intimidating, he was not coerced to sign the forms or give his consent and he did so voluntarily. Agent Curtis continued to interview the Defendant while other agents conducted the search.

The Magistrate Judge signed the search warrant for 424 Nesbitt Lane, excluding the basement apartment, at 5:48 p.m., on March 1, 2005. (Government Ex. 4.) Agent Harcum arrived at the residence with the search warrant at approximately 6:30 p.m., after the consent search had begun. The search concluded at approximately 7:30 p.m., with the seizure of a computer, several hard drives, tapes, and compact, floppy and zip discs. Although Defendant stated he did not see the search warrant until around 8:00 p.m., Defendant did not attempt to stop the search at any time nor did he request an attorney.

## II. CONCLUSIONS OF LAW

The Defendant contends the physical evidence seized from his residence and the statements he made to law enforcement should be suppressed because (1) his sixteen-year old son lacked authority to admit Agent Curtis and other officers into the residence at 424 Nesbitt Lane and (2) in violation of HIPAA Ms. Shadoin revealed information she obtained from Defendant's son in the course of providing psychotherapy to him, and but for her illegal disclosure, none of the subsequent events would have occurred.

## A. Minor's authority to admit law enforcement to the house

A minor who has common authority over the premises may give third-party consent to search the premises. United States v.

6

Clutter, 914 F.2d 775, 778 (6th Cir. 1990) (upholding search where fourteen- and twelve-year old children routinely left in exclusive control of house enjoyed degree of access and control that afforded them right to permit inspection of any room in house); Lenz v. Winburn, 51 F.3d 1540, 1548-1549 (11th Cir. 1995) (holding that minors may give third-party consent to search a residence). Defendant did not dispute that his sixteen-year old son shared with him the living quarters on the main floor of the residence at 424 Nesbitt Lane and that his son was routinely left in exclusive control of the house. Defendant stated only that he instructed his son not to admit strangers to the house without his permission. Agent Curtis and the other officers were justified in believing, however, that Defendant's son had apparent, if not actual, authority, to admit them to the premises on request. See Illinois v. Rodriguez, 497 U.S. 177, 186-188 (1990) (holding Fourth Amendment is not violated when officers enter without a warrant when they reasonably, though erroneously, believe the person who consents to their entry has authority to consent); United States v. Gillis, 358 F.3d 386, 390 (6th Cir. 2004) ("Even if a third party does not possess actual common authority over the area that was searched, the Fourth Amendment is not violated if the police relied in good faith on a third party's apparent authority to consent to the search."); United States v. Guitierrez-Hermosillo, 142 F.3d 1225, 1229-1230 (10th Cir. 1998) (upholding search of motel room

7

where officers reasonably believed third party had legal capacity to admit them and voluntarily consented to search).

It is undisputed that Defendant's son was not asked to consent to a search of the computer or the residence, nor did he give such consent to search. Rather, Agent Curtis interviewed Defendant's son to investigate his disclosure to Ms. Shadoin about Defendant's activities. Agent Curtis then utilized the information he obtained from Ms. Shadoin and Defendant's son, along with his own observations of the computer and storage media in plain view, to request a search warrant through Agent Harcum.

Upon arriving at the house, Defendant knowingly, voluntarily and intelligently waived his <u>Miranda</u> rights in writing. He also voluntarily and intelligently consented in writing to a search of his computer and related equipment, and permitted Agent Curtis to assume his identity on the Internet. <u>See</u> <u>United States v. Calhoun</u>, 49 F.3d 231, 234 (6th Cir. 1995) (noting defendant's consent to search was voluntary because she freely signed consent form and officers' testimony confirmed voluntary consent). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 227 (1973). The Government bears the burden to prove that consent was voluntary by clear and positive testimony, and the Government has met that burden here. <u>See</u> <u>U.S. v. Erwin</u>, 155 F.3d 818, 823 (6th Cir. 1998).

8

Agent Curtis told Defendant that a search warrant was enroute to the scene. Even if Defendant gave consent to search only because he believed a search warrant already had been obtained, the search was not tainted. Absent consent to search, an officer may tell a defendant he intends to get a search warrant so long as the officer's expressed intention is genuine and is not a mere pretext to induce submission to the search. United States v. Salvo, 133 F.3d 943, 954 (6th Cir. 1998). Here, Agent Curtis had already begun the process to obtain a search warrant, and in fact he obtained a search warrant at 5:48 p.m. through the efforts of Agent Harcum. Not only did Agent Curtis have Defendant's consent to search, he also had the Magistrate Judge's search warrant granting authority to search. Even if Defendant's consent to search was ineffective, the evidence would have been inevitably seized through the lawful search warrant. United States v. Taylor, 248 F.3d 506, 514 (6th Cir. 2001).

**B. The search warrant did not rest on a HIPAA violation**

Defendant claims that information included in the affidavit supporting the search warrant was obtained in violation of HIPAA and, without such information, the Magistrate Judge would not have issued the search warrant. HIPAA applies to "a health plan," "a healthcare clearinghouse," or "a healthcare provider who transmits any health information in an electronic form in connection with a transaction referred to in Section 1320d-2(a)(1) of this title." The FBI does not fit within any of these categories. See Beard v.

9

City of Chicago, 2005 WL 66074 at *2 (N.D. Ill. Jan. 10, 2005) (holding city fire department is not a "covered entity" under HIPAA).

The information Ms. Shadoin disclosed to law enforcement, moreover, does not fall within HIPAA's definition of protected "health information." The statute provides:

> The term "health information" means any information, whether oral or recorded in any form or medium, that –
> (A) is created or received by a health care provider, health plan, public health authority, employer, life insurer, school or university, or health care clearinghouse; and
> (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

42 U.S.C. § 1320d(4). The information Ms. Shadoin received from Defendant's son did not relate to the "past, present or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual." Rather, the information pertained to Defendant's conduct in possessing and viewing child pornography. Ms. Shadoin merely forwarded to Agent Curtis the same information she received from Defendant's son. She did not give him any information about the physical or mental health treatment of Defendant's son, nor did she provide any of his medical or billing records.

Even assuming the information Ms. Shadoin revealed to Agent Curtis qualified as protected health care information, such

10

information fell within an authorized exception permitting disclosure. HIPAA permits disclosure of protected health information about "an individual whom the covered entity reasonably believes to be a victim of abuse, neglect, or domestic violence to a government authority":

> (i) To the extent the disclosure is required by law and the disclosure complies with and is limited to the relevant requirements of such law;
>
> (ii) If the individual agrees to the disclosure; or
>
> (iii) To the extent the disclosure is expressly authorized by statute or regulation and:
>
> (A) The covered entity, in the exercise of professional judgment, believes the disclosure is necessary to prevent serious harm to the individual or other potential victims[.]

45 C.F.R. § 164.512(c)(1). Defendant's son reported he had seen graphic computer images depicting child sexual abuse, and Ms. Shadoin was required by state law to report it to law enforcement. See Tenn. Code Ann. § 37-1-605(a) ("Any person, including, but not limited to, any . . . mental health professional . . . who knows or has reasonable cause to suspect that a child has been sexually abused[] shall report such knowledge or suspicion[.]") Thus, Ms. Shadoin and her associates, in the exercise of their professional judgment, reasonably believed that disclosure to law enforcement was required by law and necessary to prevent serious harm to the children depicted in the images or other potential child sexual abuse victims. Further, Ms. Shadoin could not by law rely on the ordinary psychotherapist-patient

11

privilege that existed between her and her patient, Defendant's son. State law provides:

> **Evidentiary privileges inapplicable in child sexual abuse cases. –** The privileged quality of communication between . . . any professional person and the professional person's patient or client, and any other privileged communication except that between attorney and client, as such communication relates both to the competency of the witness and to the exclusion of confidential communications, shall not apply to any situation involving known or suspected child sexual abuse and shall not constitute grounds for failure to report as required by this part, failure to cooperate with the department in its activities pursuant to this part, or failure to give evidence in any judicial proceedings relating to child sexual abuse.

Tenn. Ann. Code § 37-1-614. "With regard to the distribution of child pornography, the persons who are directly and most seriously affected, and therefore identifiable as the victims, 'are the children who perform the pornographic acts.'" United States v. Hibbler, 159 F.3d 233, 237 (6th Cir. 1998) (quoting United States v. Boos, 127 F.3d 1207, 1210 (9th Cir. 1997)). And yet minors who are exposed to such graphic images of child sexual abuse are also at risk. "[T]he harm resulting from viewing [child pornography] is separate and distinct from the harm caused by molestation." United States v. Gawthrop, 310 F.3d 405, 411-412 (6th Cir. 2002). The Defendant emphasized that Ms. Shadoin had no evidence that he sexually molested his son. But even if Defendant "had not also molested [him, he] no doubt would have endured psychological trauma caused by [his] exposure to the child pornography alone." Id. Ms. Shadoin discussed the matter with the treating psychiatrist for Defendant's son, and the psychiatrist made a decision to disclose

the information to law enforcement.  Under Tennessee law, a "psychiatrist may disclose patient communications to the extent necessary to warn or protect any potential victim."  Tenn. Code Ann. § 24-1-207.  The statute further provides that "[n]o civil or criminal action shall be instituted, nor shall liability be imposed due to the disclosure of otherwise confidential communications by a psychiatrist pursuant to this subsection."  Id.  Ms. Shadoin and the treating psychiatrist with whom she worked to provide mental health services to Defendant's son had no choice but to report the information to law enforcement authorities.  No HIPAA violation resulted from the disclosure.

### III. CONCLUSION

For all of the reasons stated, Defendant Harold Mathis' Motion to Suppress (Docket Entry No. 20), and his Amended and Supplemental Motion to Suppress (Docket Entry No. 29) shall be DENIED.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE